E-FILED
Friday, 09 February, 2007  08:51:38 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KITSY J. AMRHEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3015 |
| | ) | |
| HEALTH CARE SERVICE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter is before the Court on Defendant's Motion for Summary Judgment (d/e 21), Defendant's Motion to Strike Portions of Plaintiff's Affidavit (d/e 30), and Defendant's Motion for Leave to File Supplemental Evidence (d/e 29).  Plaintiff Kitsy Amrhein was employed by Defendant Health Care Service Corporation (HCSC) from 1985 until her employment was terminated on March 1, 2004.  Amrhein's two-count Complaint (d/e 1) alleges violations of Title VII of the Civil Rights Act of 1964 by her former employer.  See 42 U.S.C. § 2000e et seq.  In Count 1, Amrhein alleges that she was discriminated against based on her gender in violation of 42 U.S.C.

§ 2000e-2(a).  In Count 2, she claims that HCSC terminated her employment in retaliation for her efforts to oppose gender discrimination in violation of 42 U.S.C. § 2000e-3.  HCSC seeks summary judgment on each of Amrhein's claims.  For the reasons set for below, HCSC's Motion for Summary Judgment is allowed.

As a preliminary matter, the Court must address Defendant's Motion to Strike Portions of Plaintiff's Affidavit and Defendant's Motion for Leave to File Supplemental Evidence.  As set forth below, the Motion to Strike is denied, and the Motion to File Supplemental Evidence is allowed, in part, and denied, in part.

1.  Motion to Strike

Defendant asks the Court to strike portions of Plaintiff's Affidavit, which was submitted as Exhibit 1 to the Memorandum of the Plaintiff, Kitsy J. Amrhein, in Opposition to the Defendant's Motion for Summary Judgment (d/e 26) (Plaintiff's Opposition).  Specifically, Defendant asserts that ¶ 18, the tenth sentence in ¶ 24, and ¶ 25 should be stricken because they conflict with Plaintiff's prior deposition testimony.  As Defendant correctly notes, "[a] plaintiff cannot . . . create an issue of material fact by submitting an affidavit that contradicts an earlier deposition."

Pourghoraishi v. Flying J, Inc., 449 F.3d 751 (7th Cir. 2006). In a situation where "a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the 'affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.'" Id. (quoting Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532-33 (7th Cir. 1999)). As set forth below, the Court finds no conflict in the identified sections, and thus, the Motion to Strike is denied.

Paragraph 18 of Amrhein's Affidavit details an incident involving supervisor Jane Marquedant that occurred on February 18, 2004. Defendant asserts that ¶ 18 includes additional conflicting information concerning an incident the Plaintiff was questioned about at pages 250 to 257 of her deposition. See Plaintiff's Opposition, Exhibit Attachment 1, Affidavit of Kitsy J. Amrhein (Amrhein Affidavit), ¶ 18, & Exhibit Attachment 2, Deposition of Kitsy J. Amrhein (Amrhein Dep.), p. 250-57.[1]

_____

[1]The Court notes that Plaintiff has attached Amrhein's Affidavit, transcripts of nine depositions, and multiple documents to her Opposition. The documents are labeled with exhibit numbers and the Court will reference them by such. The Affidavit and the transcripts, however, are not labeled on their faces. When electronically filing the Affidavit, the Plaintiff labeled it Affidavit Attachment 1, and the Court will refer to it as such. Plaintiff has labeled the nine depositions as Exhibit Attachments 2 through 10.

Specifically, Defendant points to the portion of Plaintiff's Affidavit that asserts that Marquedant made reference to Plaintiff "opening up a can of worms."  <u>See</u> <u>Amrhein Affidavit</u>, ¶ 18.  As Defendant correctly notes, Plaintiff did not testify to the "can of worms" statement by Marquedant when describing the incident in her deposition.  However, the Court does not believe that a conflict exists between ¶ 18 and Plaintiff's sworn testimony.  In relevant portion, ¶ 18 provides: "She replied by saying 'if you wanted to schedule all of your days, you should not have made a complaint.'  She went on to make reference to me 'opening up a can of worms.'"  <u>Id</u>.  Plaintiff testified in her deposition that Marquedant told her that if she wanted to pick all of her planned time off ("PTO") days, she should not have complained in the first place and should not have gone and spoken with Kathy Jett.  <u>Amrhein Dep.</u>, p. 256.  The information in the Affidavit is slightly more detailed, but not materially different from Amrhein's deposition testimony.  <u>See</u> <u>Thanongsinh v. Board of Education</u>, 462 F.3d 762, 781 n. 16 (7th Cir. 2006).  Defendant's request to strike ¶ 18 is denied.

---

The Court notes that some of the depositions are voluminous and have been broken into parts to be electronically filed.  For clarity, the Court will cite to the depositions by the attachment numbers assigned by the Plaintiff.  The Court further notes that Plaintiff has provided full transcripts of depositions while Defendant has provided only excerpts.  For consistency, the Court will cite only to Plaintiff's full versions.

Defendant seeks to strike the tenth sentence in ¶ 24 of Amrhein's Affidavit, asserting that it conflicts with Plaintiff's deposition testimony.  In ¶ 24, Plaintiff describes an instance in which she was called into supervisor Teresa Benner's office in early December 2003.  Plaintiff asserts that Benner asked her to sign a written warning regarding excessive use of the telephone for personal reasons.  Plaintiff refused to sign the warning, indicating that she felt her use of the telephone was not excessive and was much less than Scott Redpath's personal use of the telephone.  Plaintiff further states that she reminded Benner that she was experiencing a family problem at the time.  The tenth sentence of the paragraph states: "At the conclusion of the conversation, Ms. Benner who was upset stated to me 'you must think that I am a heartless bitch?'"  Amrhein Affidavit, ¶ 24.

The following exchange occurred at Plaintiff's deposition:

Q.   Did you ever complain about the use by Mr. Redpath of the phone for personal reasons?
A.   Not until I received the original of this document [the written warning].
Q.   And that was in December of 2003?
A.   Yes.
Q.   And what did you say?
A.   I said, this is not right.  If anybody should get this document, it should be Scott, because he's the one that's always making personal phone calls.
Q.   Who was a part of that meeting?

A.    Just Teresa Benner and myself.

Q.    And what did Miss Benner say in response?

A.    She said that she didn't care what he did.  She was only
       concerned with what I did.

Q.    Anything else?

A.    I'm sure there was--I mean, it got--she raised her voice and
       screamed at me.  I really don't remember everything that
       was said.

Amrhein Dep., p. 220-21.  The tenth sentence in ¶ 24 does not conflict with this testimony, and Defendant fails to identify any other conflicting deposition testimony.  Therefore, Defendant's request to strike the tenth sentence in ¶ 24 is denied.

Defendant seeks to strike ¶ 25 of Amrhein's Affidavit, which also relates to the early December 2003 incident.  Paragraph 25 provides as follows:

At no time on the date of the incident described above did I ever state to Teresa Benner that I thought she was a heartless bitch or words to that affect.  Furthermore, at no time on that date did I state "if you fuck with my family you fuck with me."

Amrhein Affidavit, ¶ 25.  Again, there is no conflict with the deposition testimony as set forth above, and Defendant fails to identify any other conflicting deposition testimony.  Defendant's request to strike ¶ 25 is denied.

2.    Motion for Leave to File Supplemental Evidence

Defendant seeks leave to file supplemental evidence consisting of five Affidavits and a series of inter-office memoranda.  Amrhein challenges the proffered Affidavits of Angela Lael, Jennifer Tabor, and Corrine Porter in full, as well as paragraph 4 of the Affidavit of Jane Marquedant dated September 18, 2006 and paragraph 6 of the Affidavit of Teresa Benner dated September 18, 2006.[2]  The challenged portions of the Affidavits deal primarily with a February 18, 2004, incident involving Marquedant and Amrhein.  See infra p. 33-36 (describing the February 18, 2004, incident). The challenged portions contradict Amrhein's testimony, which the Court must credit at this stage in the proceedings.  At most, they create an issue of fact, and the Court will not consider them in ruling on the pending Motion for Summary Judgment.  Therefore, the Court will not consider Affidavits of Angela Lael, Jennifer Tabor, and Corrine Porter, paragraph 4 of the Affidavit of Jane Marquedant dated September 18, 2006, or paragraph 6 of the Affidavit of Teresa Benner dated September 18, 2006. Defendant's Motion to Supplement is allowed in all other respects.

---

[2]The Court notes that Defendant submitted Affidavits of Marquedant and Benner dated June 27, 2006, as attachments to her Statement of Facts.  See HCSC's Statement of Facts, Ex. A.3 & A.6.  These Affidavits are not at issue in the Motion to File Supplemental Evidence.

BACKGROUND

Amrhein began her employment with HCSC in 1985.  HCSC provides services to groups that have insurance through Blue Cross/Blue Shield.  In 1997, Amrhein was promoted to a group specialist position in HCSC's Springfield (Illinois) Full Service Office, a position which she held until her termination on March 1, 2004.  Group specialists were assigned to be primarily responsible for particular customer accounts, although they were also expected to serve as back-up for other group specialists as needed.  Prior to March 2004, Amrhein was assigned to two large group health insurance accounts, United Airlines and Georgia Pacific.  Another group specialist, Scott Redpath, was also assigned to service these groups.[3]  Amrhein was considered the primary HCSC contact person for United Airlines, while Redpath was considered the primary contact person for Georgia Pacific.

As a group specialist, Amrhein was part of a Group Specialist Unit (GSU).  At the time of her termination, there were eight group specialists in Amrhein's GSU: Amrhein, Redpath, Janet Row, Ellen Moore Hall, Angela Lael, Corrine Porter, Barb Brown, and Jennifer Kelly.  Redpath was the only

---

[3]Redpath was promoted to the group specialist position at the same time Amrhein was in 1997.

male employee in the GSU.  Redpath had been employed by HCSC the longest of any employee in the GSU.  At the time Amrhein was promoted to group specialist, the GSU was supervised by Debbie Ayers.  From 1999 until 2000, Jane Marquedant supervised the GSU.  Vickie King supervised the GSU for one year in 2001, and Tina Viara supervised the GSU for six months in 2002.  From 2002 until Amrhein's termination in March 2004, the GSU was supervised by Teresa Benner.  In 2004, Karen Woods was senior manager of the Springfield Full Service Unit.  As such, she was responsible for nine group clients, each of which had at least 1,000 members.  In 2004, Benner reported to Marquedant, who reported to Woods.  Woods reported to Jim McLean.

In December 2003, Benner reported that the enrollment in the United Airlines group totaled 68,000 members.  Plaintiff's Opposition, Ex. 2.  A "digit split" was in place, dividing the group members between Amrhein and Redpath.  Two-thirds of the United Airlines group members were the responsibility of Amrhein and one-third were the responsibility of Redpath.  Id.  The enrollment in the Georgia Pacific group totaled 28,000 employees.  Id.  This group was also divided by digit.  Two-thirds of the Georgia Pacific group members were the responsibility of Redpath and one-third were the

9

responsibility of Amrhein.  Id.

In 2003 and early 2004, most of a HCSC group specialist's time would be spent responding to telephone, e-mail, and facsimile inquiries from customer groups.  During the relevant time period, HCSC group specialists were responsible for working directly with customer groups, mainly through each group's benefit office.  A group specialist would deal on an on-going basis with individuals representing the group employer.  The responsibilities of a group specialist included fielding questions about claims processing, benefit availability, and other inquiries from group members and conducting the research necessary to answer the questions.

The inquiries received by the group specialists were varied, as was the time it would take to respond to an inquiry.  The length of time a group specialist maintained an inquiry as open was monitored by the company. HCSC maintained parameters for the period of time that passed from an inquiry being received until the time it was closed.  In 2003, HCSC had an internal goal of resolving all inquiries within fourteen days of receipt.  When Benner supervised the GSU, she was responsible for making sure that things were completed in "as close to 14 days as possible."  Plaintiff's Opposition, Exhibit Attachment 3, Deposition of Teresa Benner (Benner Dep.), p. 29.

If Benner noticed that a group specialist had inquiries within his or her control that were not closed within a timely fashion, she would address the issue with the individual, and if it were a repetitive problem, Benner would document it. In 2003, HCSC employee Misty Younkin was responsible for inventory. It was Younkin's responsibility to monitor the status of inquiries that were open for more than fourteen days. If an inquiry was older than fourteen days, Younkin would contact the group specialist to check up on it.

The quality of a group specialist's work was monitored by quality coordinators. From January 2003 until at least March 2004, Melissa Cooper and Stephanie Kelly held the only quality coordinator positions with HCSC for the Springfield Full Service Unit. As a part of the quality monitoring, the coordinators would randomly tape record telephone calls of group specialists and listen to them. In late 2002 or early 2003, Benner informed the group specialists that their phone calls would be monitored as part of the quality program. The group specialists expressed concern about the auditors listening to personal telephone calls. Benner stated that she was aware that from time to time group specialists made or received personal telephone calls and when that happened, the auditors were

instructed not to listen to those calls.  Amrhein Dep., p. 158-59.  The quality coordinators also reviewed group specialists' written work for accuracy of information.

HCSC maintained ethical standards for its employees to follow. Stephanie Kelly testified that if, while listening to a recorded call, she believed that a group specialist had done or said something that violated HCSC's ethical code, she would report it to the individual's supervisor. Plaintiff's Opposition, Exhibit Attachment 6, Deposition of Stephanie Kelly, p. 10.   HCSC's applicable discipline policy differentiated between performance and attendance issues on one hand and violations of conduct standards on the other.   Plaintiff's Opposition, Ex. 23, Corrective Action Policy.   The policy provided that: "[p]rogressive action is generally appropriate to address performance and attendance issues" and that "each subsequent infraction may result in increasingly severe consequences."  Id., p. 3.  Progressive actions include counseling, verbal warning, written warning, probation, and involuntary termination.  Id.  The approval of Workforce Relations was necessary prior to applying the steps out of sequence.  Id.  According to the policy: "[t]he consequences for violations of Conduct Standards are based on the specific standard violated and

whether the violation is a first-time offense or the employee has previously violated the policy." Id., p. 9.  The policy recognizes that "[s]ince violations of any standard vary by circumstance, a range of discipline levels is considered." Id.  The policy set out four levels of discipline for conduct violations as follows: Level 1 – counseling; Level 2 – counseling with unsatisfactory performance appraisal and no salary increase; Level 3 – counseling with unpaid leave, an unsatisfactory performance appraisal, and no salary increase (a demotion, transfer or recision of officership may also be considered); Level 4 – termination of employment.  Id., p. 10-11.

HCSC's ethical code addresses misuse of corporate assets, which Benner took to encompass misuse of the telephones.  Benner noted that while she supervised the group specialists, she allowed them "to make brief, brief phone calls as necessary" regarding personal matters.  Benner Dep., p. 50.  After the monitoring of group specialists' recorded calls began, the quality coordinators were required to audit a certain number of calls each month. Plaintiff's Opposition, Exhibit Attachment 5, Deposition of Melissa Cooper (Cooper Dep.), p. 12.  When a quality coordinator was reviewing a tape of a group specialist's telephone calls, she would fast forward through personal calls.  Id., p. 13-14.  Quality coordinator Cooper testified that if

"there wasn't enough work to meet our quota for the month of audits because the tapes were filled up with personal phone calls" she would report the frequency of personal calls to Benner.  Id., p. 14, 17-18.  Cooper testified that she felt that Redpath, Moore, Rowe, and Amrhein made frequent personal calls.  Id., p. 15.  Benner testified that "[i]f there were complaints of, if the quality area made any type of complaints that they were making excessive calls at the point that, actually at the point that it became excessive throughout the department [she and Marquedant] started monitoring it somewhat."  Benner Dep., p. 50-51.  Benner estimated that the additional monitoring began in early to mid-2003.  Id., p. 51.  She stated that she and Marquedant would pull the quality tapes for the group specialists and if a tape revealed a significant amount of personal phone usage, they would address it.  Id.  According to Benner, the supervisors did not listen to every single tape every month, but rather reviewed only some of each employee's tapes.  Id., p. 58.

Amrhein testified that as soon as Benner took over as her supervisor, she began receiving criticism regarding her conduct and performance at work.  Amrhein Dep., p. 170.  In October 2002, Amrhein went on a two-week vacation.  Although Redpath was designated to cover Amrhein's

workload while she was away, Amrhein testified that he did not do so.  Id.,
p. 130-31.  When Amrhein returned to work, she had to work overtime to
clear up the backlog.  Id., p. 131.  Amrhein felt that she was being treated
unfairly because she was expected to keep up with Redpath's work when he
was gone.  Id.  Amrhein complained about Redpath's conduct to Benner,
another supervisor, and everyone in her unit.  Id., p. 132.

Prior to January 2003, Amrhein became concerned that she was
getting a disproportionately greater amount of work to perform than
Redpath.  In early 2003, Benner created 2003 performance reviews for
Amrhein and Redpath.  Plaintiff has submitted copies of these 2003
performance reviews, which are both dated February 10, 2003.  Plaintiff's
Opposition, Ex. 8 & 9.  Amrhein testified that she received a copy of her
2003 performance review at the end of January 2003.  Amrhein Dep., p. 99-
100.  Amrhein's evaluation states that she "meets and at times exceeds the
standard" in all competency areas.  Plaintiff's Opposition, Ex. 8, p. 2.  It
further states that Amrhein "meets the targeted standard" with respect to
contribution to the team and technical quality.  Id., p. 3.  An annual merit
increase worksheet attached to Amrhein's evaluation reveals that her current
salary was "19.29."  Id., p. 5.  With a 2% increase, the worksheet notes a

new salary of "19.68." Id.  Amrhein did not believe that her review was accurate. Amrhein Dep., p. 100.  She complained to Benner and Woods about the evaluation. Id., p. 100-01.

Amrhein also formed the opinion that Redpath had received a better review than she had. Amrhein Dep., p. 82-84.  Amrhein did not see Redpath's actual evaluation, but formed her opinion based on his comments and actions. Id.  Redpath's 2003 performance review states that he "meets and at times exceeds the standard" in two competency areas and "meets the targeted standard" in the third. Plaintiff's Opposition, Ex. 9, p. 2.  The review notes that Redpath "meets and at times exceeds the goal" in contributions to the team and "greatly exceeds the standard" with respect to technical quality. Id., p. 3.  An annual merit increase worksheet attached to Redpath's evaluation reveals that his current salary was "18.29." Id., p. 4.  With a 4% increase, the worksheet notes a new salary of "19.02." Id.

In January 2003, while reviewing a tape of Amrhein's telephone conversations, quality coordinator Cooper came across a portion that she thought could potentially constitute a problem.  Cooper referred the matter to Benner for review.  Benner reviewed the conversation and forwarded it to Karen Woods.  Woods concluded that Amrhein had violated HCSC's

16

Code of Conduct.  By Memorandum dated January 31, 2003, Woods informed Amrhein that she had been "overheard exchanging proprietary business information with an employee of one of our competitors." HCSC's Statement of Undisputed Material Facts with Respect to its Motion for Summary Judgment (d/e 23) (HCSC's Statement of Facts), Ex. C. E. Specifically, Woods noted that Amrhein had "mentioned information regarding our fee schedule for Reimbursement/Subrogation and our HIPAA [Health Insurance Portability and Accountability Act] readiness program." Id.  As a result, Amrhein was suspended without pay for five days and placed on probation.  Id.  The Memorandum stated: "Any future inappropriate behavior in the workplace will result in further disciplinary action up to and including termination.  At the next review period, you will receive an unsatisfactory performance review and will not be eligible for a merit increase." Id.  The Memorandum was signed by Woods, McLean, and Amrhein.  Id.

Amrhein testified that her suspension arose out of a telephone call she had with Gayle Bernstein, a representative of a competing company, Anthem, which like HCSC, was a licensee of Blue Cross/Blue Shield. Amrhein Dep., p.184-85, 192.  The record contains a transcript of this

17

telephone conversation.   When Bernstein was discussing the issue of

reimbursement/subrogation, the following exchange occurred:

> Ms. Bernstein: Really?
> Ms. Amrhein: Yeah.  We get like 30 percent.
> Ms. Bernstein: Really?
> Ms. Amrhein: I, don't quote me on that.
> Ms. Bernstein: Yeah?
> Ms. Amrhein: That allowance.  But I know we, they charge for that.

HCSC's Statement of Facts, Ex. C.D, p. 3.  Later, the conversation turned

to HIPAA, as follows:

> Ms. Amrhein: How do you feel about HIPPA [sic]?  You guys ready?
> Ms. Bernstein: Well, we're getting there.
> Ms. Amrhein: Scares the hell out of me.
> Ms. Bernstein: Me too.
> Ms. Amrhein: I just, I don't know enough about it.  The part I heard the loudest was I can go to jail.
> Ms. Bernstein: I haven't heard that.
> Ms. Amrhein: Yeah.  If you give out information you're not supposed to, you can go to jail personally or be fined personally, your own personal bank account, my personal life where, you know, I don't want to be sitting behind bars for this company.
> Ms. Bernstein: My God.
> . . .
> Ms. Amrhein: But yeah.  I don't know.  It's like 90 days away, and I'm like I just don't feel comfortable.  I don't have enough info.  Only because, you know, if they hadn't told me I'm going to jail.
> Ms. Bernstein: Yeah.
> Ms. Amrhein: I probably wouldn't care.  You know, okay, fine.  You'll tell me what I need to know, but I want to know.  I want

to have time to ask questions.
Ms. Bernstein: Yeah.
Ms. Amrhein: And telling me the day before just isn't going to
be making me comfortable.  I don't know.  We'll see.  But I
think it's going to be like major.  We're just not used to that
kind of stuff.

Id., p. 7-8, 10.

Amrhein asserts that nothing in the exchange warranted a suspension.

Amrhein Dep., p. 200-01.  According to Amrhein, the true reason for the

suspension was that she questioned her 2003 performance review.  Id.

Amrhein testified that the suspension occurred "a day apart" from her

complaint.  Id., p. 201.  Amrhein appealed the suspension to Austin

Waldron who upheld the decision.  Id., p. 74-77.

After Amrhein received notice of the suspension, she contacted

HCSC's "compliance" department hotline.  Amrhein Dep., p. 79-81.

Amrhein complained that her suspension was in retaliation for her appeal

of the performance evaluation.  Id., p. 80.  Bill Moore from the compliance

department contacted Amrhein at home during her suspension.  Id., p. 81.

Amrhein repeated her claims of retaliation and raised other issues as well.

Amrhein testified that Moore never responded to her complaints of

retaliation, but rather seemed to focus on other issues.  Id., p. 80.

During 2003, on approximately fifty occasions, inventory control specialist Younkin e-mailed either Redpath or Benner to inform them that Redpath's inquiries had aged beyond the time expected under Company policy.  See Plaintiff's Opposition, Ex. 3.  Several inquiries had aged beyond one hundred days with no work being done on them.  Benner had at least a couple discussions with Redpath in 2003 regarding his timeliness.  However, she never created any contemporaneous written documentation of Redpath's untimeliness.  Benner testified that at the time she did not believe that Redpath's conduct warranted written documentation.  Benner Dep., p. 125.  When asked to explain her rationale, Benner pointed to the fact that there were other individuals who had aging issues as well.  Benner testified that Ellen Moore Hall also received "a lot" of e-mails from Younkin regarding aging; however, Benner stated that she has no way of knowing whether Hall received more or less e-mails than Redpath.  Id., p. 127.  In Redpath's annual performance review dated February 10, 2003, Benner noted "Scott needs to focus on his aging and follow up skills, as he [is] commonly missing cycletime goals."  Plaintiff's Opposition, Ex. 9, p. 3.  In Redpath's annual performance review dated February 9, 2004, Benner noted that Redpath "needs to continue to focus on his follow-up skills, as he still

has issues with cycletime goals occasionally." <u>Plaintiff's Opposition</u>, Ex. 12, p. 3.

From 2002 to 2004, Redpath had an on-going attendance problem. Benner documented Redpath's unsatisfactory attendance with written warnings and "extended" written warnings on several occasions between December 31, 2002, and January 30, 2004. <u>Benner Dep.</u>, p. 44-45. In May 2004, Redpath was placed on ninety-days of probation concerning his attendance. <u>Id</u>., p. 45. Additionally, group specialists had mandatory overtime requirements. At times, Redpath failed to work his mandatory overtime. As a result, Redpath received a verbal and then a written warning concerning mandatory overtime.

Amrhein's father passed away on June 9, 2003, and her brother-in-law died unexpectedly on September 12, 2003. <u>Amrhein Aff.</u>, ¶ 20. Amrhein served as the executor of both of their estates. <u>Id</u>. As a result, from time to time during the late summer and fall of 2003, Amrhein was required to make personal telephone calls during normal work hours to handle estate matters. <u>Id</u>. Amrhein asserts that "[b]ecause of this situation, [her] use of the telephones for non-business purposes was somewhat greater during this period than it had normally been." <u>Id</u>. Amrhein explained to Benner that

21

she had additional family responsibilities because of the deaths.  Id.

The week prior to Thanksgiving 2003, Amrhein's niece who was in Mankato, Minnesota, began expressing suicidal intentions.  Amrhein Aff., ¶ 21.  Her father was the brother-in-law who had died in September 2003. Id.  The niece was hospitalized over Thanksgiving.  Id.  The following week, in early December 2003, Amrhein used the telephone during normal working hours to attempt to schedule a flight for the niece to fly to Arizona. Id., ¶ 22.  Amrhein was placed on hold, and during that time, a HCSC claimant called and insisted on speaking with Amrhein.  Id., ¶ 23.  Benner approached Amrhein's desk and asked her whether she was on a business or personal call.  Amrhein informed her that it was personal.  Id.  Co-worker Jan Rowe knew of Amrhein's family problem and offered to take the call for Amrhein.  Id.  Benner stated that she would take the call.  Id.  Benner returned to her desk and picked up the phone.  Id.  At that point, the conference light on Amrhein's phone illuminated.  Id.  Benner appeared to Amrhein to be listening in on Amrhein's telephone call as Amrhein concluded her business with the airline.  Id.

Approximately ten minutes after Amrhein ended her call with the airline, Benner asked Amrhein to come to her desk.  Amrhein Aff., ¶ 24.

22

Amrhein did so, at which point Benner presented her with a written warning concerning excessive use of the telephone for personal purposes.  Id.; see also HCSC's Statement of Facts, Ex. C.F.  The warning, dated December 2, 2003, stated:

> In the month of October your telephone line was monitored as part of our routine telephone auditing program.  During this audit period, a large portion of the conversations taped were found to be personal in nature.
>
> There were three tapes, one was blank and therefore two tapes were reviewed.  Within the two tapes reviewed for accuracy, there was a total of over 36 minutes of personal calls.

HCSC's Statement of Facts, Ex. C.F.  Benner asked Amrhein to sign the written warning, and Amrhein refused.  Amrhein informed Benner that she was "not aware of the calls she was referring to and [she] did not believe [her] telephone usage was excessive."  Amrhein Aff., ¶ 24.  Amrhein also explained that she felt that her personal use of the phones was much less than Redpath's and if she were to receive a written warning, Redpath should receive one first.  Id.  Benner indicated that she was not concerned with Redpath, only with Amrhein's use of the telephone.  Id.

The parties disagree as to what transpired next.  Under Amrhein's version, which the Court must credit at this stage of the proceedings, at the

conclusion of the conversation, Benner, who was upset, stated: "You must think that I am a heartless bitch?" Id. Amrhein asserts that she did not respond, and the conversation concluded. Id. The next day, Amrhein complained to Marquedant about Redpath's personal use of the phones and Amrhein's belief that Benner was treating her unfairly. Amrhein Dep., p. 145-151, 221.

On the Monday following December 3, 2003, Marquedant, Benner, and Amrhein met. Amrhein Dep., p. 151-52. According to Amrhein, the women "discussed the hostility" and the fact that Amrhein felt she "was being treated unfairly as opposed to Scott [Redpath]." Id., p. 152. Amrhein stated her belief that Benner was subjecting her to additional scrutiny by listening in on her telephone calls by using a conference feature on the phones. Id., p. 152-156. According to Amrhein, Benner denied this. Id., p. 156. Amrhein asserts that she requested a mediator and mentioned that the EEOC might provide one free of charge. Id., p. 157. Amrhein asserts that she stated that she "might have to file a complaint in order to get that, but that [she] was willing to do so." Id. According to Amrhein, Benner replied by stating in a very loud tone that Amrhein "was too concerned about the law." Id. Amrhein asserts that "Marquedant jumped

in to change the subject quickly and calm her down."  Id.

On December 12, 2003, Amrhein e-mailed Marquedant expressing concern over her treatment in the workplace.  Plaintiff's Opposition, p. 26, Plaintiff's Additional Undisputed Fact No. 76; HCSC's Reply to Response to Motion for Summary Judgment (d/e 31) (HCSC's Reply), Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 39.  Specifically, Amrhein complained that she had significantly greater work responsibilities than her male counterpart; that her male counterpart was treated preferentially; and that her productivity far exceeded his.  Plaintiff's Opposition, p. 26, Plaintiff's Additional Undisputed Fact No. 76; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 39.  Amrhein complained about Redpath's aging, his use of unplanned personal time, and his failure to work required overtime.  Plaintiff's Opposition, p. 26, Plaintiff's Additional Undisputed Fact No. 76; HCSC's Reply , Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 39.  Amrhein asserts that she sent this e-mail to Marquedant to let her know that she felt she was being discriminated against and to ask for help in resolving the issues. Plaintiff's Opposition, p. 26, Plaintiff's Additional Undisputed Fact No. 76.

On December 17, 2003, Amrhein's e-mail was transmitted to HCSC Human Resources Representative Yvonna Cosey.  Plaintiff's Opposition, p. 26, Plaintiff's Additional Undisputed Fact No. 77; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 40.  Cosey was responsible for looking into Amrhein's concerns.  Cosey met with Benner to gather information and asked Marquedant and Benner to respond to Amrhein's allegations.  Plaintiff's Opposition, p. 26, Plaintiff's Additional Undisputed Fact No. 77; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 40.  Marquedant and Benner prepared a response, which was given to Cosey, but not shared with Amrhein.  Plaintiff's Opposition, Exhibit Attachment 7, Deposition of Jane Marquedant (Marquedant Dep.), p. 43-44.  Cosey also interviewed Amrhein.  Plaintiff's Opposition, p. 26-27, Plaintiff's Additional Undisputed Fact No. 78; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 40.

Woods became aware of Amrhein's concerns and discussed them with Marquedant.  Plaintiff's Opposition, p. 27, Plaintiff's Additional Undisputed Fact No. 79; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 40.  After completing her investigation, Cosey

reported her findings to Woods.  Plaintiff's Opposition, p. 27, Plaintiff's Additional Undisputed Fact No. 80; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 41.

On January 14, 2004, Amrhein met with Cosey and Marquedant. Cosey informed Amrhein that she found no evidence of discrimination. Amrhein Dep., p. 244.  According to Amrhein, Cosey "would not go into it in any further detail."  Id.  When Amrhein began to ask questions, Marquedant "jumped in" and stated that she found no evidence of favoritism when comparing Amrhein and Redpath's reviews.  Id.  Amrhein inquired as to whether Redpath received a larger pay raise than she did, but Marquedant, citing confidentiality requirements, refused to answer her.  Id. Marquedant and Cosey did not address the other points Amrhein raised, other than to state that the issues were being addressed.  Id., p. 245-46. Amrhein indicated that she intended to file a complaint with the EEOC. Id., p. 246.  Marquedant and Cosey agreed that it was certainly within Amrhein's right to file an EEOC complaint, and they did nothing to discourage her from doing so.  Id.  During the January 14, 2004, meeting, Marquedant presented Amrhein with Benner's written warning for excessive personal use of the company telephones in October.  Amrhein again refused

to sign the document.  Id., p. 212-214.

On January 15, 2004, Marquedant sent a Memorandum to Benner summarizing the January 14, 2004, meeting.  Plaintiff's Opposition, Ex. 20. The Memorandum stated: "We told Kitsy that we did not find any basis to her allegation of sexual discrimination.  She seemed less than satisfied with this result and is going to exercise her right to file a claim with the EEOC." Id.  Marquedant also informed Woods of the meeting and Amrhein's desire to pursue an EEOC claim.  Plaintiff's Opposition, Exhibit Attachment 9, Deposition of Karen Woods (Woods Dep.), p. 40.

In late January 2004, Amrhein met with Marquedant and Benner regarding her 2004 annual performance review.  Amrhein Aff., ¶ 27.  During the meeting, the three women discussed the relationship between Benner and Amrhein.  Id.  Both Benner and Amrhein agreed that they could do things to improve the relationship.  Id.

The next day, there was another conversation between Marquedant, Benner, and Amrhein.  Amrhein Aff., ¶ 28.  Amrhein discovered that she was not going to receive a salary increase and expressed concerns about that decision.  Id.  Marquedant described Amrhein as "very defensive, very argumentative" during the conversation, and noted that when Amrhein

28

walked out of the door she stated: "I will see you at a deposition, sitting across from me at a deposition someday." <u>Marquedant Dep.</u>, p. 59-60.

In late 2003, HCSC changed the system under which group specialists were allowed to take planned time off or PTO after receiving complaints from group specialists about the current system.  Amrhein preferred the prior system to the new one.  <u>Amrhein Dep.</u>, p. 228-29.  In late January or early February 2004, Amrhein complained to Marquedant and Benner about the 2004 vacation schedule Benner had created for the group specialists which Amrhein believed favored Redpath over her.  <u>Id.</u>, p. 222. Prior to complaining, Amrhein spoke with another supervisor, Kathy Jett, to confirm the way in which the new PTO scheduling system was supposed to work.  Jett administered the PTO scheduling system for HCSC's service representatives, which was the basis for the new system for group specialists. After receiving Amrhein's complaint, Benner agreed that she had made a mistake and informed Amrhein that it would be rectified.  <u>Id.</u>, p. 237. Amrhein asserts that she was harassed by her co-workers for pointing out the mistake because the vacation schedule was redone.  <u>Id.</u>, p. 238. Amrhein complained to Marquedant about this harassment.  <u>Id</u>

On February 2, 2004, Redpath received a written warning regarding

personal use of the telephones from Benner.  <u>HCSC's Statement of Facts</u>,

Ex. C.G.  The warning stated:

> In the month of December your telephone line was monitored as part of our routine telephone auditing program.  During this audit period, a large portion of the conversations taped were found to be personal in nature.
>
> Within the two tapes reviewed for accuracy, there was a total of over 42 minutes of personal calls.

<u>Id</u>.  Redpath signed the written warning.  <u>Id</u>.

On February 4, 2004, Woods sent an e-mail to McLean, asking for some uninterrupted time to discuss their "options" with Amrhein. <u>Plaintiff's Opposition</u>, Ex. 31.  Woods explained that Amrhein "is being a huge challenge and it is disruptive to the unit and it is costing us a huge amount of time and resources."  <u>Id</u>.

On February 9, 2004, Benner issued her 2004 annual performance review for Amrhein.  <u>Plaintiff's Opposition</u>, Ex. 11.  The performance review states that Amrhein "meets and at times exceeds the standard" in two competency areas and "significantly exceeds the targeted standard" in a third.  <u>Id</u>., p. 2.  Benner noted that "Kitsy maintains a very good relationship with the group contacts assigned her;" "Kitsy has good analytical and follow-up skills.  She makes decisions easily and displays

commitment;" and "Kitsy has a very good knowledge of divisional and departmental policies and procedures." Id.  According to the review, Kitsy "meets the targets standard" for contributions to the team and "greatly exceeds standards" with respect to technical quality.  Id., p. 3.  The review noted that Amrhein failed to meet standards with regard to ethical acumen. Id., p. 4.  Amrhein was not eligible for a merit salary increase because of the January 2003 code violation.

In 2003 and 2004, group specialists could apply for a corporate credit card which was to be used only for company travel.  The card was issued in the employee's name, and the employee received the bill personally.  Benner Dep., p. 93-94.  According to Woods, the company had an arrangement with a credit card company to secure access to credit cards for certain employees.  Woods testified that the company did not guarantee the payments on the credit cards.  Woods Dep., p. 89-90.  The employee would pay the bill with money received from submitting his or her expense report. Id., p. 94.

In early 2004, Redpath used his corporate credit card for business related travel expenses.  Redpath recognized that he was expected to pay the bill when it arrived; however, he was late in paying the credit card company

for the charges.  Redpath testified that he was "not sure what happened, but [he] received the bill."  Plaintiff's Opposition, Exhibit Attachment 8, Deposition of Scott Redpath (Redpath Dep.), p. 63.  Redpath further stated that he received a late notice and "didn't realize that [he] actually didn't, couldn't pay it at that time."  Id., p. 63-64.  According to Redpath, he then paid the bill.  Id., p. 64.  Redpath admitted that he had been reimbursed for the expenses at issue, and explained: "I wasn't sure what happened.  I just knew I didn't have the money in my account.  I'm not sure why I didn't at the time."  Id.  Redpath testified that he made HCSC aware of the problem in that he told Benner and Woods that he had received a late notice and did not realize that he had not paid the bill and that he would pay it.  Id., p. 64-65.  At the time he notified his supervisors, Redpath needed to pay the card right away or he would no longer be able to use it.  Id., p. 65.  Redpath did not receive any discipline from HCSC relating to this incident.  Id.

At some point prior to February 18, 2004, group specialist Ellen Moore Hall complained by e-mail to Benner about what she perceived to be unfairness in the new PTO scheduling system.  Plaintiff's Opposition, p. 34-35, Plaintiff's Additional Undisputed Fact No. 104; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 53.  Hall

subsequently had a conversation with Benner about the new system. Plaintiff's Opposition, p. 35, Plaintiff's Additional Undisputed Fact No. 105; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 53.  Later, Hall was sitting at her desk when she heard Benner discussing vacation planning with other employees.  Hall stood up and loudly stated that the system was not fair.  Plaintiff's Opposition, p. 35, Plaintiff's Additional Undisputed Fact No. 105; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 53.  Benner reprimanded Hall for her outburst and indicated that this type of behavior would not be tolerated.  Plaintiff's Opposition, p. 35, Plaintiff's Additional Undisputed Fact No. 105; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 53.

On the afternoon of February 18, 2004, Marquedant met with the group specialists to discuss the new PTO scheduling system.  Plaintiff's Opposition, p. 35, Plaintiff's Additional Undisputed Fact No. 106; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 55-56.  Amrhein asserts that she and Ellen Moore Hall were seated the furthest from Marquedant and could not hear her.  Amrhein asserts that, as a result, both women moved closer to Marquedant.  Marquedant explained that the

group specialists' PTO would be scheduled in the same way as that of the service representatives.  <u>Plaintiff's Opposition</u>, p. 35, Plaintiff's Additional Undisputed Fact No. 106; <u>HCSC's Reply</u>, Ex. A, <u>HCSC's Reply to Plaintiff's Additional Material Facts</u>, p. 55-56.   Marquedant went on to describe how the system would work.  Amrhein believed that Marquedant's description was inconsistent with the way in which the service representatives' PTO was scheduled, based on information she had received from Kathy Jett.  <u>Plaintiff's Opposition</u>, p. 35-36, Plaintiff's Additional Undisputed Fact No. 106; <u>HCSC's Reply</u>, Ex. A, <u>HCSC's Reply to Plaintiff's Additional Material Facts</u>, p. 55-56.

Amrhein avers that she was confused by the inconsistencies and asked Marquedant for clarification.  <u>Amrhein Aff.</u>, ¶ 18.  Amrhein asserts that she explained what she had been informed by Jett and informed Marquedant that she had over twenty days of PTO accumulated.  <u>Id</u>.  According to Amrhein, Marquedant responded by stating: "'if you wanted to schedule all of your days, you should not have made a complaint'" and went on to reference Amrhein "'opening up a can of worms.'"  <u>Id</u>.  Amrhein testified that Marquedant became loud during the confrontation, but that she did not.  <u>Amrhein Dep.</u>, p. 250.  Amrhein testified that she kept asking for

clarification, and Marquedant kept repeating herself, becoming louder each time.  Id., p. 254.

After the meeting was over, Amrhein and Marquedant started a one-on-one conversation.  Plaintiff's Opposition, p. 37, Plaintiff's Additional Undisputed Fact No. 107; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 56.  Amrhein asserts that she did not raise her voice in talking with Marquedant.  Ellen Moore Hall testified that she was approximately 10 feet away from Marquedant and that it did not appear to her that the women were yelling at each other.  Plaintiff's Opposition, Attachment Ex. 10, Deposition of Ellen Moore Hall (Hall Dep.), p. 17-19.  Hall, however, could not hear what the women were saying.  Id.  Group specialist Jan Rowe testified that she was approximately three or four steps away from Amrhein and Marquedant during their discussion.  HCSC's Statement of Facts, Ex. B.8, Deposition of Jan Rowe, p. 10.  Rowe characterized the conversation as "argumentative."  Id., p. 11.  She stated that Marquedant used a frustrated tone while Amrhein sounded "[l]ike she had a point to make, and she wasn't going to let it drop."  Id.  At some point after the incident, Rowe contacted Woods to complain about the atmosphere in the GSU.  Id., p. 12.  Rowe specifically identified

Amrhein as someone who made her feel uncomfortable.  Id., p. 12-13.

Benner documented the February 18, 2004, incident in writing. HCSC's Statement of Facts, Ex. C.K.  Benner noted that: "[t]he more that Jane tried to explain and reinforce the policy, the more Kitsy questioned and argued.  Jane kept repeating herself over and over again, she finally gave up and told Kitsy that we would have yet another supervisor, Kathy Jett, review the policy for fairness."  Id.

On February 20, 2004, Marquedant sent an e-mail to Woods describing the conversation of February 18, 2004.  Plaintiff's Opposition, Ex. 30.   In the e-mail, Marquedant described Amrhein as "very argumentative" and "loud."  Id.  Marquedant wrote that she "felt that Kitsy was trying to convince [her] to agree with what she was saying, by continuing to question the process."  Id.

During February 2004, Marquedant was listening to a tape of Amrhein's calls from January 14, 2004, to monitor personal phone usage. Marquedant Dep., p. 22-23.  The tape had already been reviewed by a quality coordinator.  Id., p. 23-24.  The tape contained a recording of a call between Amrhein and Cathy Perricone, an employee of United Airlines' benefits department.    Marquedant believed that Amrhein acted

inappropriately during the call.  Id., p. 22.  The quality coordinator who reviewed the tape, however, had not flagged the conversation for management review.  Marquedant transcribed the Perricone call in an e-mail dated February 27, 2004, to Benner and Woods.  HCSC's Statement of Facts, Ex. C.I.  The e-mail reads as follows:

> Cathy: I called at 11:00 this morning.  What time did you guys get in?
> Kitsy: I was here at 8:30.
> Cathy: And it came on that . . .
> Kitsy: We were all stuck on the phones.
> Cathy: No, it came on that . . . a recording came on . . . when nobody's . . .
> Kitsy: That's because we signed off of your gate that you get us on and we were signed in to, like service rep gates, all of us, cuz somehow they're down a whole bunch of reps . . .
> Cathy: Oh!  Get out!
> Kitsy (laughing): No!  They had a whole bunch, I don't know, they had a couple call in sick and whatever, I don't know.  They were down too many, so they came and got us all.. [sic]
> Cathy: Guarantees and all that . . .
> Kitsy: Yeah!  Oh, yeah!  Yeah!
> Cathy: Yep.
> Kitsy: Of course, I don't get my work done . . .
> Cathy: Nope
> Kitsy: . . .  but they don't pay a guarantee then.

Id.  After receiving the e-mail, Woods listened to the taped conversation and consulted with Cosey, McLean, and Bill Moore about it.  Woods Dep., p. 55-56.

A performance guarantee is a contractual performance expectation that HCSC must meet.  Marquedant Dep., p. 106.  If the expectation is not met, there could be a financial penalty.  Id.  In early 2004, HCSC had a written confidentiality policy under which employees were forbidden to share proprietary business information with unauthorized persons.  Proprietary business information included financial information, descriptions of company processes or operations, and information in contracts to which HCSC was a party, among other things.  Plaintiff's Opposition, p. 34, Plaintiff's Additional Undisputed Fact No. 102; HCSC's Reply, Ex. A, HCSC's Reply to Plaintiff's Additional Material Facts, p. 52.       Cosey testified that Woods and Marquedant telephoned her twice to seek advice about the situations with Amrhein.     Plaintiff's Opposition, Exhibit Attachment 4, Deposition of Yvonna Cosey (Cosey Dep.), p. 9-10.  Cosey explained that her role was to consult with management regarding whether it was "okay to terminate."  Id., p. 7.  In the first conversation, the women discussed the February 18, 2004, incident.  In a subsequent conversation, the women discussed the Perricone conversation.   When Woods and Marquedant asked Cosey what their options were following the Perricone conversation, Cosey stated that they could suspend Amrhein or terminate

her employment.  Id., p. 15-18.

Woods and Marquedant made the decision to terminate Amrhein after consulting with Cosey.  Prior to recommending that Amrhein be terminated, Cosey listened to the tape of the Perricone conversation, had two telephone conversations with Woods and Marquedant, two telephone calls with her supervisor Nora Bliss, and one conference call with Bliss, Woods, and Marquedant.  Cosey did not interview Amrhein or Perricone.  In making her recommendation, Cosey considered the fact that Amrhein had a past code of conduct violation, resulting in her 2003 suspension.  Cosey Dep., p. 92-93.

Amrhein was terminated on March 1, 2004.  The two reasons provided by HCSC for the termination were: (1) the Perricone conversation and (2) Amrhein's insubordination in her February 18, 2004, conversation with Marquedant.  Amrhein filed a charge with the EEOC and received a right to sue letter.  Amrhein then filed the pending Complaint on January 25, 2005.

## ANALYSIS

HCSC seeks summary judgment on each of Amrhein's claims. Summary judgment is appropriate when "the pleadings, depositions,

answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact and that judgment as a matter of law is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  When a properly supported motion for summary judgment has been made, the party opposing summary judgment may not merely rest on the pleadings but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "A party must present more than mere speculation or conjecture to defeat a summary judgment motion."  Liu v. T & H Machine, Inc., 191 F.3d 790, 796 (7th Cir. 1999).  The Court must consider the evidence in the light most favorable to the non-moving party, here Amrhein, and draw all reasonable inferences in her favor.  See Anderson, 477 U.S. at 255.

A.   Gender Discrimination Claim (Count 1)

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," based on the individual's gender.  42 U.S.C. § 2000e-2(a)(1).  Amrhein alleges a disparate treatment claim.  Specifically, she asserts that HCSC discriminated against her by treating a similarly-situated male employee, Redpath, differently and more favorably than her.  She can avoid summary judgment on her gender discrimination claim "either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the McDonnell Douglas formula."  Rudin v. Lincoln Land Community College, 420 F.3d 712, 719-720 (7th Cir. 2005) (citing cases); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Amrhein asserts that she can overcome summary judgment under either the direct proof method or the McDonnell Douglas method.  However, Amrhein's argument relating to the direct proof method deals only with her retaliation claim.  See Plaintiff's Opposition, p. 44-49.  Thus, in considering her gender discrimination claim, the Court turns to the indirect McDonnell Douglas analysis.

Amrhein has the initial burden of demonstrating that: (1) she belongs

to a protected class, (2) she performed her job satisfactorily, (3) she suffered a materially adverse employment action, and (4) similarly-situated employees outside of her protected class were treated more favorably. McDonnell Douglas, 411 U.S. at 802.  If Amrhein can establish this prima facie case, the burden of production shifts to HCSC to provide a legitimate, nondiscriminatory reason for its decisions.  Id.  If HCSC satisfies its burden, the burden shifts back to Amrhein to show that HCSC's explanation was pretextual.   Farrell v. Butler Univ., 421 F.3d 609, 613 (7th Cir. 2005).  "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown."  Id. (internal quotations and citation omitted).  "Pretext means a dishonest explanation, a lie rather than an oddity or an error."  Id. (internal quotations and citation omitted).

HCSC argues that Amrhein cannot establish her requisite prima facie showing with respect to the second and fourth prongs of the McDonnell-Douglas test.  Because the first and third prongs are not disputed, the Court addresses them briefly at the outset.  Amrhein is female, Redpath is male, satisfying the first prong.  Turning to the third prong of the McDonnell-Douglas analysis, Amrhein asserts that, in several respects, Defendant was

not even-handed in its treatment of her and Redpath. As the Seventh Circuit has recently cautioned: "it is essential to distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions." Minor v. Centocor, Inc., 457 F.3d 632, 634 (7th Cir. 2006) (citing cases). Many of the actions alleged by Amrhein do not rise to the level of material differences. Three actions, however, could constitute material differences. Specifically, Amrhein alleges that HCSC discriminated against her by compensating Redpath differently and more favorably than her, by making her perform more work than Redpath, and by terminating her employment unfairly.

Turning to the second prong, HCSC maintains that Amrhein was not performing her job satisfactorily in that she committed conduct violations in January 2003 and January 2004; she was insubordinate to Marquedant in February 2004; and she was a difficult employee. The Court, however, finds that a question of fact exists with respect to this prong. The Court notes that the digit split, under which Amrhein was assigned more members than Redpath, was in place prior to January 2003. Moreover, Amrhein

alleges that Redpath did not keep up with her work while she was on vacation in October 2002, causing her to have to work overtime. According to Amrhein, Redpath was not disciplined, despite her complaints. It also appears from the record that Amrhein and Redpath's January 2003 salary increases were set prior to HCSC's determination that Amrhein had violated the code of conduct when speaking to Gayle Bernstein. Additionally, Amrhein's 2004 annual performance review, dated February 9, 2004, is generally favorable. Plaintiff's Opposition, Ex. 11.

Moreover, viewed in the light most favorable to Amrhein, a factual dispute exists as to whether Amrhein disclosed confidential information to Perricone in January 2004. The transcript of the conversation is fairly innocuous, and a HCSC quality coordinator had reviewed the tape prior to Marquedant without flagging a concern. Similarly, Amrhein's version of the February 18, 2004, incident with Marquedant creates a question of fact with respect to her alleged insubordination. Amrhein's version is supported in part by the testimony of Ellen Moore Hall. Therefore, the Court continues to the fourth McDonnell-Douglas prong.

To establish her prima facie case of gender discrimination, Amrhein must show that she was treated less favorably than a similarly-situated male.

44

"[T]o satisfy the similarly situated prong of the prima facie case, an employee must be directly comparable in all material respects." Ineichen v. Ameritech, 410 F.3d 956, 960 (7th Cir. 2005) (internal quotations and citation omitted). Amrhein must "show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them." Id. at 960-61 (internal quotations and citation omitted).

Amrhein's Complaint alleges that HCSC discriminated against her by compensating Redpath differently and more favorably than her. Complaint, ¶ 20. Amrhein, however, devotes little time to this theory on summary judgment. Amrhein asserts that, beginning in January 2003, HCSC gave Redpath a disproportionally greater salary increase than it gave her, considering their respective duties, responsibilities, and prior performance records. Amrhein testified in her deposition that at the time in question, Redpath was making less than she was, despite the fact that he had been with the company one or two years longer than she had. Amrhein Dep., p. 112. Indeed, during the time that both were employed by HCSC, there was never a time at which Redpath received higher compensation than Plaintiff.

HCSC's Statement of Facts, p. 20, Defendant's Undisputed Material Fact No. 99; Plaintiff's Opposition, p. 5 (conceding, but deeming immaterial Defendant's Undisputed Material Fact No. 99); see also HCSC's Statement of Facts, Ex. A.6, Affidavit of Jane Marquedant (Marquedant Aff.), ¶ 3. During their respective reviews in 2003, Redpath received a 4% merit increase in pay while Amrhein received a 2% merit increase in pay.  HCSC's Statement of Facts, p. 24-25, Defendant's Undisputed Material Fact No. 123; Plaintiff's Opposition, p. 4; see also Marquedant Aff., ¶ 4.  However, Amrhein concedes that "[a]t this time, pursuant to HCSC salary range guidelines, Redpath was entitled to a larger increase than Plaintiff because he was below the salary range mid-point for the Group Specialist position. In contrast, Plaintiff was above this mid-point and was only eligible for a smaller percentage increase."  HCSC's Statement of Facts, p. 24-25, Defendant's Undisputed Material Fact No. 123 (internal citations omitted); Plaintiff's Opposition, p. 4; see also Marquedant Aff., ¶ 4.  Therefore, Redpath and Amrhein were not similarly-situated with respect to the 2003 salary increases.

Plaintiff further alleges that HCSC discriminated against her by giving her more work than Redpath.  "Extra work can be a material difference in

the terms and conditions of employment." <u>Minor</u>, 457 F.3d at 634. Amrhein asserts that she was given more work than Redpath in the digit split and that Redpath was not disciplined for failing to back her up as required. However, it is undisputed that during the time that both were employed by HCSC, there was never a time at which Redpath received higher compensation than Plaintiff. <u>HCSC's Statement of Facts</u>, p. 20, Defendant's Undisputed Material Fact No. 99; <u>Plaintiff's Opposition</u>, p. 5 (conceding, but deeming immaterial Defendant's Undisputed Material Fact No. 99); <u>see also</u> <u>HCSC's Statement of Facts</u>, Ex. A.6, <u>Affidavit of Jane Marquedant (Marquedant Aff.)</u>, ¶ 3. Therefore, even if Amrhein was given more work, she was also compensated better than Redpath. Amrhein fails to point to evidence that would show that she and Redpath were similarly-situated with respect to work distribution. Finally, Amrhein asserts that she was discriminated against when her employment was terminated based on a code of conduct violation while Redpath's was not. Specifically, Amrhein points to Redpath's failure to pay his company credit card on time on one occasion. As an initial matter, Redpath is not similarly-situated because his conduct was clearly different than Amrhein's. <u>See Ineichen</u>, 410 F.3d at 961. Furthermore, Amrhein had committed a previous code of conduct

violation, in January 2003, that was substantially similar to the conduct which formed the basis for her January 2004 violation.  While Amrhein notes that her January 2003 suspension may not have been justified, the record contains the transcript of Amrhein's conversation with Bernstein, which supports HCSC's decision.  See HCSC's Statement of Facts, Ex. C.D. Redpath admittedly had also received past employment discipline; however, Redpath's prior discipline related to performance and attendance issues, which were treated differently than conduct violations under HCSC's written discipline policy.  Therefore, Amrhein fails to point to evidence that would support a finding that she and Redpath were similarly-situated with respect to disciplinary problems.  Because Amrhein fails to identify a similarly-situated male employee who was treated more favorably than she was, she cannot establish a prima facie case of gender discrimination. HCSC is entitled to summary judgment on Count 1 of her Complaint.

B.    Retaliation Claim (Count 2)

Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  The range of conduct prohibited under Title VII's retaliation provision is broader than under Title VII's discrimination provision.  See Burlington Northern & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2414 (2006).  Amrhein asserts that HCSC retaliated against her because she complained about what she believed to be the company's preferential treatment of Redpath.  HCSC moves for summary judgment on this count as well.

Amrhein may establish a prima facie case of retaliation, sufficient to overcome the HCSC's Motion for Summary Judgment utilizing either the direct method or indirect method.  Amrhein asserts that she can overcome summary judgment under either method.  The Court turns first to the direct approach.  The Seventh Circuit has recently clarified its application of the direct method.  See Sylvester v. SOS Children's Villages Illinois, 453 F.3d 900, 902-04 (7th Cir. 2006).  Under the direct method, Amrhein "can defeat summary judgment by 'present[ing] direct evidence . . . that [s]he engaged in protected activity . . . and as a result suffered the adverse employment action of which [s]he complains.'"  Phelan v. Cook County, 463 F.3d 773, 787 (7th Cir. 2006) (quoting Stone v. City of Indianapolis Public Utilities

Division, 281 F.3d 640, 644 (7th Cir. 2002)).  The record is devoid of evidence of an admission of retaliatory motive by HCSC.  Amrhein, however, may nevertheless succeed under the direct method "by presenting sufficient circumstantial evidence such that a jury could infer retaliation." Id.  (citing Culver v. Gorman & Co., 416 F.3d 540, 546 (2005)).  "'If [the evidence] is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive.'"  Id. (quoting Stone, 281 F.3d at 644).

Amrhein asserts that the record contains "plentiful circumstantial evidence of a connection between the Plaintiff's announced intention to pursue her claim of gender discrimination to EEOC and her termination from employment with the Company."  Plaintiff's Opposition, p. 45. Amrhein points first to the fact that only six weeks elapsed between the time she informed her supervisors that she intended to file an EEOC claim and the date her employment was terminated.  "[S]uspicious timing alone rarely is sufficient to create a triable issue. . . . while [t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, . . .it is clear that mere temporal proximity is not

enough to establish a genuine issue of material fact." <u>Tomanovich v. City of Indianapolis</u>, 457 F.3d 656, 665 (7th Cir. 2006)(internal quotations and citations omitted).  Amrhein's employment was terminated on March 1, 2004.  The Court notes that under Amrhein's version of the facts, in a meeting with Marquedant and Benner on the Monday following December 3, 2003, Amrhein stated that she was willing to file an EEOC complaint. <u>Amrhein Dep.</u>, p. 157.  This was nearly three months prior to her termination.  The Seventh Circuit has held that a three-month proximity alone could not reasonably support a causal connection for a retaliation claim. <u>Sauzek v. Exxon Coal USA, Inc.</u>, 202 F.3d 913, 919 (7th Cir. 2000). Moreover, according to Amrhein, she had been complaining about gender discrimination since October 2002.  Finally, nearly six weeks passed between Amrhein's January 14, 2004, announcement of her intention to file an EEOC charge and her termination.  Amrhein herself realizes that this is not the rare case where temporal proximity alone is sufficient to establish a causal connection, and thus, the Court turns to an analysis of Amrhein's other circumstantial evidence.

In addition to the temporal proximity, Amrhein points to: (1) the fact that her supervisors had a pattern of acting out against her when she

complained about alleged preferential treatment of Redpath; (2) Woods'
February 4, 2004, e-mail to McLean, asking for time to discuss their
"options" with Amrhein; (3) the fact that the transcript of the Perricone
conversation arguably does not reveal a breach of confidentiality; and (4)
the fact that Marquedant overstated Amrhein's behavior during the
February 18, 2004, incident.  Even taken as a whole, this evidence is
insufficient to establish a causal link between Amrhein's announced
intention to file an EEOC charge and her termination.  Six weeks represents
a fairly substantial passage of time.  Amrhein herself admits that there were
issues other than her EEOC claim brewing during this time.   While
Amrhein's 2004 performance review was for the most part favorable, it did
note her 2003 conduct violation.  By late January 2004, Amrhein had
expressed her disagreement about the decision not to give her a merit salary
increase in 2004.  Also in late January 2004, Amrhein admitted that she
could do things to improve her relationship with her supervisor Benner.  At
her January 14, 2004, meeting with Marquedant and Cosey, Amrhein
refused to sign Benner's written warning regarding personal telephone use
for a second time.  Amrhein was also raising concerns about the new system
for scheduling PTO during this time.  Amrhein fails to identify sufficient

circumstantial evidence such that a reasonable jury could infer that HCSC acted with a discriminatory motive when it terminated her employment. Amrhein's fails to establish a prima facie case of retaliation under the direct method.

The indirect method utilized an adaptation of the <u>McDonnell-Douglas</u> test. <u>See</u> <u>Sylvester</u>, 453 F.3d at 902. Under the indirect method, Amrhein must show that after opposing the employer's allegedly discriminatory practice, only she, and not any similarly-situated employee who did not file a charge, was subjected to retaliatory conduct even though she was performing her job in a satisfactory manner. <u>Id</u>. This method of establishing a prima facie case requires proof both of a similarly- situated employee and of the Plaintiff performing her job satisfactorily. <u>Id</u>. HCSC asserts that Amrhein fails to satisfy each of these elements. However, as set forth above in the Court's analysis of Amrhein's gender discrimination claim, a question of fact exists with respect to whether Amrhein was performing her job satisfactorily at the time of her termination. Therefore, the Court turns its attention to the similarly- situated employee prong.

To survive summary judgment, Amrhein must identify a non-complaining employee who is similarly-situated with regard to performance,

qualifications, and conduct.  Anders v. Waste Management of Wis., 463 F.3d 670, 676 (7th Cir. 2006) (citing cases).  "This normally entails a showing that the [comparable] employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Id. (internal quotations and citations omitted).  Amrhein points to Ellen Moore Hall, Redpath, and Woods as similarly-situated.

Ellen Moore Hall was a group specialist, who, like Amrhein, reported to Benner.  According to Amrhein, Hall engaged in disruptive conduct and received only a reprimand.  Like Amrhein, Hall disagreed with the new PTO scheduling system.  At some point prior to February 18, 2004, Hall was sitting at her desk when she heard Benner discussing vacation planning with other employees.  Hall stood up and loudly stated that the system was not fair.  Benner reprimanded Hall for her outburst and indicated that this type of behavior would not be tolerated.  According to Hall, she spoke in a louder voice during her incident with Benner, than Amrhein did in her February 18, 2004, incident with Marquedant.  Hall Dep., p. 23-24.  However, the Court notes that Hall shouted out one statement to her immediate

supervisor, Benner, while Amrhein repeatedly questioned Benner's supervisor, Marquedant, during and after a unit meeting.  Moreover, there is nothing in the record to indicate that Hall had any prior or contemporaneous conduct violations.  Hall is not similarly-situated to Amrhein.

Turning to Redpath, he too was a group specialist, who, like Amrhein reported to Benner.  Amrhein asserts that Redpath's failure to pay his company credit card bill on time constituted a serious conduct violation, for which he received no discipline.  It is undisputed that Redpath paid the credit card balance after receiving the late notice before his right to use the card was suspended.  He also brought the incident to his supervisors' attention.  A delay in paying a credit card bill for which Redpath was financially responsible is distinguishable from Amrhein's conduct of releasing confidential information.  Moreover, while Redpath had received discipline for attendance and performance issues, there is nothing in the record to indicate that he had a prior conduct violation.  This fact distinguishes Redpath from Amrhein, who had been previously suspended for a conduct violation based on conduct that was very similar to the conduct that formed the basis for her 2004 conduct violation.  Additionally,

Amrhein's employment was not terminated solely on the basis of the conduct violation; she also had been insubordinate to Marquedant in the February 18, 2004, incident.  Redpath is not similarly- situated to Amrhein.

Finally, Amrhein asserts that Woods had released confidential information to Perricone prior to the Amrhein Perricone conversation. According to Amrhein, shortly after Benner became Amrhein's supervisor, Amrhein participated in a meeting with McLean, Woods, Redpath, Benner Perricone, and Perricone's supervisor John Kozar.  Plaintiff's Opposition, p. 33-34, Additional Undisputed Fact No. 100.  Kozar had only recently assumed his position.  During the meeting, Woods explained:

> [T]hat Company employees were assigned to specific group accounts and had primary responsibility for those accounts; however, those Company employees were also cross-trained to handle work on other accounts as well.  She explained that in the event an unusual circumstance occurred which caused the call volume of a particular account to rise, it was the Company's practice to move employees from their assigned account to handle the needs of that account.  She indicated that the Company gave performance guarantees to their clients because it felt confident that this system could timely handle the needs and demands of their clients.

Id.  As an initial matter, the Court notes that Woods is several steps above Amrhein in HCSC's corporate structure.  Woods does not report to Benner or Marquedant, but rather these two women report to Woods.  The context

of Woods' disclosure, a business meeting which included her supervisor, McLean, in which Woods was briefing new United Airline representative Kozar, is distinguishable from Amrhein's telephone disclosure to Kozar's employee Perricone.  Moreover, the content of the information relayed by Woods was general, while the Amrhein Perricone conversation dealt with a specific situation of understaffing.  Woods is not similarly-situated to Amrhein.  Therefore, Amrhein fails to identify a similarly-situated non-complaining employee who was treated more favorably than she was. Amrhein cannot establish a prima facie case of retaliation under the indirect method.  HCSC's request for summary judgment on Count 2 is allowed.

## CONCLUSION

THEREFORE, as set forth above, Defendant's Motion to Strike Portions of Plaintiff's Affidavit (d/e 30) is DENIED, and Defendant's Motion for Leave to File Supplemental Evidence (d/e 29) is ALLOWED, in part, and DENIED, in part.  Defendant's Motion for Summary Judgment (d/e 21) is ALLOWED.  Defendant is entitled to summary judgment on all of Plaintiff's claims.  All pending motions, including Defendant's Motion for Leave to Take Additional Discovery (d/e 35) and Defendant's Motion for Leave to File a Reply with Respect to its Motion for Leave to Take

Additional Discovery (d/e 37) are DENIED as MOOT.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   February 8, 2007.

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE